## J. S. CARROLL MERCANTILE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

### Docket Nos. 4222, 11744. Promulgated August 25, 1927.

1. Upon organization petitioner issued to stockholders notes for excess of value of assets paid in over par value of stock. In 1913 the notes were canceled and the excess value of assets over par value of stock allowed to remain in the business. *Held*, that such excess may be included in invested capital.

2. On the evidence, *held*, petitioner may not include in invested capital the earnings credited to stockholders' accounts.

*W. H. Albritton, Esq.*, and *M. F. Cronin, Esq.*, for the petitioner.
*J. W. Fisher, Esq.*, for the respondent.

Deficiencies in income and profits taxes have been determined by the Commissioner as follows:

| | |
|---|---|
| Fiscal year ended July 31, 1918 | $13,762.60 |
| Fiscal year ended July 31, 1919 | 11,069.66 |
| Fiscal year ended July 31, 1920 | 11,797.68 |
| | 36,629.94 |

Petitioner alleges that the Commissioner erred in excluding from invested capital amounts originally paid in by the stockholders in excess of the capital stock, together with subsequent earnings, and in the determination of petitioner's tax liability under sections 327 and 328 of the Revenue Act of 1918.

FINDINGS OF FACT.

In August, 1912, J. S. Carroll died, leaving a will in which he named as his beneficiaries his wife, Almira Carroll, his half-brother, Dock Jones, and his half-sister, Tinie Bowers. Among the assets was the mercantile business of J. S. Carroll & Co., which prior to Carroll's death had been conducted as a sole proprietorship.

This business passed to the three beneficiaries in the following proportions: One-half to his wife, one-fourth each to his brother and sister.

Under date of August 27, 1912, the beneficiaries organized a corporation under the laws of the State of Alabama, known as the J. S. Carroll Mercantile Co., for the purpose of continuing the business and conveyed thereto all the assets and property coming into their hands as heirs and legatees of the late J. S. Carroll with the exception of certain stocks in other corporations belonging to them under the terms of the will. The property so conveyed was to pay first for the $50,000 authorized capital stock of the corporation and the stockholders were to have credit for the balance of the value of the assets transferred. Two hundred fifty shares of the capital stock were issued to Mrs. Carroll and 125 shares each to Mrs. Bowers and Dock Jones. The total value of the assets transferred to the corporation was $246,692.90, of which amount $50,000 was applied in payment of the capital stock, leaving a balance of $196,692.90, one-half of which amount was credited to Mrs. Carroll and one-fourth each to Mrs. Bowers and Dock Jones. Notes were given by the corporation, due one year hence, covering the value of the property transferred in excess of the capital stock, each stockholder receiving a note of the corporation covering his proportionate amount.

At the time the corporation was organized the stockholders were not experienced in the mercantile business and it was agreed that the business should be conducted rather as an experiment for twelve months in order to determine whether it could be successfully operated on the same scale as had marked the operations of J. S. Carroll, or whether the parties should operate on a more restricted basis. It was for this reason that the capitalization was limited and the amounts paid in in excess of that limited capitalization were treated as loans. It was agreed between the parties that should the result of the experiment prove successful, the notes should be canceled and the

property theretofore paid in should be permanently invested in the corporation. The notes bore no interest and none was ever paid to the stockholders for the money so advanced. The first year's operations were successful. It was then determined that the notes theretofore issued by the corporation should be surrendered and canceled and that all of the assets and property theretofore transferred to the corporation should be taken over by it as a part of its assets. This was done on or about August 1, 1913.

At the time of the organization of the corporation there were set up on its books three accounts, one for each of the stockholders, and each account was designated as a "loan account." To each of these accounts was credited the proportionate amount which represented the excess of the value of the property transferred to the corporation over the amount applied in payment of the respective shares of stock purchased. These accounts continued on the books and each year there would be credited thereon the profits of the business, and any withdrawals made by the stockholders were likewise charged. The amounts of the profits so credited were treated by the individual stockholders as income to them and were reported in their income-tax returns.

There was an understanding between the stockholders that they might each withdraw without restriction amounts necessary for their ordinary living expenses, but no greater amounts were to be withdrawn without express authority theretofore granted. It was understood, however, that the withdrawals were not to be in an amount great enough to reduce the original amount paid in to the corporation and this amount so paid in on August 1, 1913, was never reduced, the withdrawals never exceeding the amount of the profits or subsequent deposits made by the stockholders to the corporation and credited to their respective accounts. No interest was ever paid or agreed to be paid on any of the amounts credited to the respective stockholders.

In order to conduct the business, it was necessary for the corporation to borrow large sums of money and during the respective years set out below they did borrow from outside sources the following amounts:

| Year: | Amount | Year: | Amount |
|---|---|---|---|
| 1913 | $250,000 | 1917 | $110,000 |
| 1914 | 140,000 | 1918 | 100,000 |
| 1915 | 142,000 | 1919 | 110,000 |
| 1916 | 225,000 | 1920 | 145,000 |

OPINION.

ARUNDELL: No proof was proffered in support of the allegation that the Commissioner used improper comparatives in determining

petitioner's tax liability under sections 327 and 328. On this issue the Commissioner must therefore be affirmed.

Section 326 of the Revenue Act of 1918, specifically provides that invested capital does not include borrowed capital. Our problem then is to determine whether the $196,692.90 represented a loan to the corporation or a capital contribution at the time the notes theretofore given were canceled, on or about August 1, 1913. The only witness called states that on that date the obligation to pay the stockholders this sum for the property theretofore transferred to the corporation ceased and it was then agreed that this amount should be risked in the business as a part of the corporation's capital. The fact that the so-called "loan accounts" were not closed out on the books we do not regard as conclusive for tax liability is not to be determined solely as a matter of bookkeeping. *Baldwin Locomotive Works* v. *McCoach*, 221 Fed. 59. Profits for each year were credited to these accounts and deposits were likewise entered, but it is interesting to note that the withdrawals never exceeded these amounts and never encroached on the original sums paid in in 1913, a fact that corroborates the testimony of the witness Bowers that this amount was not subject to withdrawal but was an amount invested in the business permanently. We are satisfied from the evidence that this is a fact, and consequently it should be included in petitioner's invested capital. The evidence is lacking, however, which would warrant the inclusion in invested capital of the earnings and subsequent deposits credited to the individual accounts. These amounts were freely withdrawn from time to time, more or less at the will of the stockholders, and have all the earmarks of sums left with the petitioner solely as a matter of convenience and in no sense invested in the business.

*Judgment will be entered on 15 days' notice, under Rule 50.*

Considered by MILLIKEN and MURDOCK.